IN RE: AL–KARIM, INC., Debtor.

**Salim Merchant I and Sadruddin Husein, Movants,**

v.

**Ultra Group of Companies, Inc., Respondents.**

**CASE NO. 11–71585–WLH**

United States Bankruptcy Court, N.D. Georgia, Atlanta Division.

Signed April 8, 2015

M. Denise Dotson, M. Denise Dotson, LLC, J. Hayden Kepner, Jr., Scroggins & Williamson, Atlanta, GA, for Debtor.

CONTESTED MATTER

*ORDER ON OBJECTION TO CLAIM OF ULTRA GROUP OF COMPANIES, INC.*

Wendy L. Hagenau, U.S. Bankruptcy Court Judge

This matter came before the Court on the "Objection to Proof of Claim filed by Ultra Group of Companies, Inc. and Request for Reimbursement of the Movants' Attorneys' Fees" ("Objection") (Docket No. 56), filed on November 14, 2014 by Salim Merchant I ("Merchant I")and Sadruddin Husein ("Husein"). The Debtor, Al–Karim, Inc. ("Debtor" or "Al–Karim") joined in the Objection on January 6, 2015 (Debtor, Merchant I and Husein are collectively referred to as "Objectors"). Ultra Group of Companies, Inc. ("Ultra") filed its response in opposition. The parties submitted briefs in connection with the Objection and the Court held hearings on the Objection on January 15, 2015 and February 17–18, 2015. At the conclusion of the hearings, the Court made oral Findings of Fact and Conclusions of Law, which are incorporated herein. The Court has jurisdiction over this matter pursuant to 28 U.S.C. § 1334 and this is a core proceeding pursuant to 28 U.S.C. § 157(b)(2)(A) and (B). This Order, together with the Court's oral ruling, constitutes the Court's Findings of Fact and Conclusions of Law.

## I. Findings of Fact

Debtor owned and operated a convenience store at 3384 E. Ponce De Leon Avenue in Scottdale, Georgia ("Ponce Store"). The Ponce Store operated under a lease with P & C Investment Group, Inc. ("Real Property Lease"). The Real Property Lease was dated July 1, 2000 and expired by its terms on August 31, 2010 at midnight. When the Real Property Lease expired, Al–Karim did not renew it and ceased operating the Ponce Store.

The Debtor is owned by brothers, Merchant I and Salim Merchant II ("Merchant II"), and their father, Husein. The Merchant brothers and their father own interests in other companies that operated convenience stores: Al–Rahim, Inc. is owned by Merchant II and Husein. AlRahim operated a convenience store at 4513 Rockbridge Road, Stone Mountain, Georgia ("Rockbridge Store"); Al–Ali, Inc. is owned by Merchant I and his father. Merchant I testified that he is only a minority owner in Al–Ali. Al–Ali operated convenience stores at 1785 Panola Road, Ellenwood, Georgia ("Panola Road Store") and Highway 53, Hoschton, Georgia ("Highway 53 Store). Al–Ali, Inc. sold the Highway 53 Store in late 2003 or early 2004. (The Rockbridge Store, Panola

Road Store and Ponce Store are referred to collectively as "Stores").

Ultra was in the business of providing amusement machines to various locations, such as convenience stores. On July 8, 2003, Merchant I executed a "Game Machine Location Lease" ("2003 Lease") for a 12–month term. This 2003 Lease was signed personally by Merchant I and did not include any corporate names. The 2003 Lease referenced a Schedule A for locations covered by the 2003 Lease. Ultra contends a handwritten document was attached to the 2003 Lease as Schedule A and that handwritten document, which included addresses for the Panola Road, Rockbridge, Ponce and Highway 53 Stores, bound those stores to the 2003 Lease. Merchant I contends he wrote those addresses simply as recommendations for places where Ultra could seek to place their machines. In any event, after execution of the 2003 lease, Ultra provided game machines to the Ponce, Rockbridge, Panola Road and Highway 53 stores. The store owner in each instance retained 70% of the revenue generated by the game machines.

As the expiration of the 2003 Lease approached, Ultra employee George Schmidt went to the Ponce Store to meet with Merchant I regarding the execution of a new contract. When he arrived, the parties began marking up the form agreement. Mr. Schmidt agreed with Merchant I to make the percentage payment to Al–Karim 70% (rather than the 50% stated in the form agreement). Mr. Schmidt handwrote at the top of the 2004 Lease, "See Schedule A" and at the very end of the 2004 Lease, "See Exhibit A and Schedule A". During his conversation with Merchant I, Mr. Schmidt learned that the Highway 53 Store had been sold the prior year to an unrelated party. Mr. Schmidt and Merchant I could not reach agreement on the remaining terms of the form agreement. Merchant I wanted an incentive to enter into another agreement. Mr. Schmidt then took the form agreement, as marked up, back to the Ultra office.

Nizar Damani, the CEO of Ultra, and Merchant I discussed the requested incentive. Ultra agreed to pay Al–Karim $20,000 for the execution of the agreement. Nizar Damani visited Merchant I's location, bringing with him the partially filled-out agreement that Merchant I and Mr. Schmidt had worked on, a $20,000 check, and a typed version of the location list eliminating the Highway 53 Store. When he arrived at the Ponce Store, Merchant I asked for an additional incentive to sign the contract. The parties agreed that Al–Karim would receive "every twelfth week free", meaning Ultra would not receive any commission from the game machine proceeds every twelfth week. Nizar Damani handwrote this agreement on the typed Schedule A. The handwritten portion on the Schedule A is initialed by Merchant I and Nizar Damani, and Merchant I signed the Schedule A. Ultra and the Debtor then signed the "Amusement Machine Location Lease Agreement" ("2004 Lease") dated July 23, 2004. The 2004 Lease is signed by Merchant I with the name "Al–Karim, Inc.", along with an address, written under the signature. Merchant I's signature did not state the capacity in which he signed. The 2004 Lease governs the relationship between the Debtor and Ultra, and is the genesis of Ultra's proof of claim. (The 2004 Lease is pages 23–27 of Ultra's Claim, Exhibit M–1.)

After the execution of the 2004 Lease, Ultra recorded the lease in DeKalb and Henry Counties. Copies of the 2004 Lease were also attached to the complaints discussed below. In some instances, the handwritten Schedule A from 2003 was attached to the 2004 Lease and in other

instances the typed Schedule A from 2004 was attached. The Court nevertheless finds that that 2004 Lease itself was the same in every instance. The Court finds that Nizar Damani brought the 2004 Lease back to his office with the typed Schedule A. The Court finds that his signature was not notarized until the 2004 Lease was copied to be submitted to a court for recording or as an exhibit but that otherwise the 2004 Lease remained the same. The Court also finds that Ultra's employees mistakenly attached the handwritten copy of Schedule A from 2003 to one or more copies of the 2004 Lease.

Ultra, the Debtor and the Stores operated under the 2004 Lease, largely as written, until July 2007. At that point, the Debtor and Ultra agreed the division of game machine revenue at the Ponce Store would be 80% to the Debtor and 20% to Ultra (rather than the 70/30 split stated in the 2004 Lease). Ultra would periodically send a collector to each Store location to determine the revenue from each machine for that period. The Store owner would typically remove the cash from the game machine on a daily or other regular basis. When the collector arrived at the Store, data stored in the game machine reflected the amount of money that had been deposited in the machine and the amount of rewards that had been paid out by the machine. Based on this game machine information, the collector would then calculate the appropriate division of the revenue between the Store and Ultra. The Store owner may pay Ultra that day, or make subsequent payment to Ultra's office. It was not uncommon for the game machines to be exchanged for newer or different machines and for the number of machines to vary from time to time. On December 4, 2008, Ultra received a call from the Panola Store to pick up its machines. Ultra received a similar call on March 30, 2009 to pick up its machines from the Ponce Store.

Ultra sued Merchant II, Debtor and Al-Rahim, Inc. in Gwinnett County Superior Court in January 2008, alleging a breach of the 2004 Lease by the Rockbridge Store. That lawsuit resulted in a consent judgment ("Consent Judgment") dated August 12, 2010, against the Debtor in the principal amount of $102,000, plus post-judgment interest in the amount of 6.25% per year. The Debtor was represented by Begner & Begner in connection with the Consent Judgment. At the time, the firm represented another game machine provider in game-related litigation against the State of Georgia. Ultra was also a party to that litigation but was not represented by Begner & Begner. In May 2009, Ultra sued the Debtor, Merchant II, and other entities in Gwinnett County Superior Court for alleged breaches of the 2004 Lease related to the Ponce and Panola Road Stores. Ultra argued the Debtor breached the 2004 Lease in several respects, including by demanding removal of Ultra's machines.

No ruling was made in the 2009 suit because the Debtor filed a bankruptcy petition on July 28, 2011. Ultra filed the only proof of claim in the case on May 14, 2012 ("Claim"). Ultra later amended the Claim several times, the latest amendment being on January 12, 2015 ("Claim"). The Claim seeks $1,117,891.16. Ultra modified the Claim again during the course of the hearing. The Objectors and Ultra disputed several key facts, and additional Findings of Fact are included in the discussions below.

## II. Conclusions of Law

A proof of claim is *prima facie* valid unless an objecting party makes a colorable challenge to the proof of claim. *E.g., In re Nicole Gas Prod., Ltd.,* 502

B.R. 780, 782 (Bankr.S.D.Ohio 2013) (citation omitted). The Objectors have presented a colorable challenge to the Claim. Ultra has the ultimate burden of proof on its Claim and must substantiate it by a preponderance of the evidence. *See id.*

The Claim is generally divided into three parts. First, Ultra asserts a claim based on the Consent Judgment against the Debtor. Second, Ultra asserts a claim against the Debtor for an alleged breach of the 2004 Lease for the Panola Road Store by terminating the relationship prior to expiration of the term. Finally, Ultra asserts that the Debtor is liable to it for breach of the 2004 Lease for the Ponce Store. This claim consists of damages for an alleged conversion of funds that should have been paid to Ultra under the 2004 Lease and for the Debtor's alleged breach of the 2004 Lease by terminating the relationship before the expiration of the term. The Objectors raised numerous arguments that the Consent Judgment and 2004 Lease are unenforceable. The issues pertaining to the Consent Judgment are distinct from the 2004 Lease claims, so the Court will first address the arguments related to the Consent Judgment.

## A. Rockbridge Consent Judgment

The parties do not dispute that Al–Karim entered into the Consent Judgment, and that a copy of it is attached to the Claim. The Objectors, however, argue that the Consent Judgment was a result of collusion and fraud because Begner & Begner, the law firm that represented Al–Karim in entering into the Consent Judgment, allegedly represented Ultra in other litigation. Ultra denied this contention. The facts established at the hearing that Ultra was not represented by Begner & Begner. The Begner law firm that represented the Debtor did represent other gaming companies in litigation against the State of Georgia in a case in which Ultra participated. However, Ultra was represented in that litigation not by the Begner firm, but by Wimberly Lawson Steckel Schneider & Stine, P.C., the same attorneys representing Ultra in this matter.

Moreover, the Objectors are simply in error in claiming that this Court can "undo" the judgment of the state court. In Georgia, a judgment "void on its face may be attacked in any court by any person." O.C.G.A. § 9–11–60. Such an attack is referred to as a "collateral attack". If the judgment is not void on its face, the judgment may only be attacked in the court that rendered the judgment, by a motion for a new trial or motion to set aside. *Id.* Similarly, the Rooker–Feldman doctrine set out by the Supreme Court makes clear that federal courts are not to sit as courts of appeal of state court judgments, and federal courts are expected to respect state court judgments. *Green v. Jefferson Cnty. Com'n,* 563 F.3d 1243, 1249 (11th Cir.2009).

Here, the Consent Judgment is not void on its face. There is nothing on the face of the Consent Judgment that indicates the Superior Court of Gwinnett County did not have authority to enter the Consent Judgment or that the parties were not subject to the personal jurisdiction of the Superior Court. *See Rice v. Champion Bldgs., Inc.,* 288 Ga.App. 597, 600, 654 S.E.2d 390 (2007). Thus, if the Objectors wish to attack the Consent Judgment, it must be done in the court where the judgment was rendered, which is the Superior Court of Gwinnett County.

The Objectors cite *Pepper v. Litton* from the Supreme Court and *In re XYZ Options, Inc.* from the Eleventh Circuit for the proposition that a bankruptcy court may set aside a judgment that is inequitable. *Pepper v. Litton,* 308 U.S. 295, 60 S.Ct. 238, 84 L.Ed. 281 (1939); *Dionne v.*

*Keating (In re XYZ Options, Inc.)*, 154 F.3d 1262 (11th Cir.1998). However, the *Pepper v. Litton* and *In re XYZ Options, Inc.* cases are not applicable here. In each of those cases, a trustee attacked a judgment the debtor had consented to, but which injured other creditors. *Pepper*, 308 U.S. at 312, 60 S.Ct. 238; *In re XYZ Options, Inc.*, 154 F.3d at 1270. As the cases make clear, the attack was not a collateral attack or a direct attack but rather an attack by a stranger to the judgment to protect the rights of creditors. In those cases, the debtor was believed to be part of the fraud, having consented to a judgment in order to effectively transfer its assets to someone else or to protect assets from valid creditors. Here, the allegation is that the creditor obtaining the judgment committed the fraud, not that the Debtor was involved in the fraud. Moreover, it is important to note that the only creditor in this bankruptcy case is Ultra; there are no third parties that need the protection of the equitable remedy invoked in *Pepper v. Litton* and *In re XYZ Options, Inc.* Consequently, the only place to attack this Consent Judgment is, in the Superior Court of Gwinnett County. Since the Consent Judgment remains valid under state law, Ultra's claim for it is allowed with interest to the petition date at the rate of 6.25%.

■ The Objectors next contend that the Rockbridge Consent Judgment bars any further claims by Ultra with respect to either the Ponce or Panola Road locations based on *res judicata*. While the principles of *res judicata* apply to bar the relitigation of claims which were made or could have been made in a prior lawsuit, they do not bar a subsequent lawsuit for any breach that had not occurred when the first suit was brought. *See Exec. Fitness, LLC v. Healey Bldg. Ltd. P'ship*, 290 Ga. App. 613, 614–15, 660 S.E.2d 26 (2008).

■ Under Georgia law, if a contract is "entire", then only one action may be brought; if, however, the contract is "severable", or if breaches occur at successive periods in an "entire" contract, separate actions may be brought, but all breaches occurring as of commencement of the action must be included. O.C.G.A. § 13–6–14. An entire contract is one where "the whole contract stands or falls together." O.C.G.A. § 13–1–8. In an entire contract, the consideration is a single sum certain, e.g., a note. The whole quantity, service or thing, forms the essence of an entire contract. A severable contract is the opposite, i.e., the amount due depends on the parties' actions during the term of the contract, or where an "indefinite total amount [is] payable in installments". *Carswell v. Oconee Reg'l Med. Ctr., Inc.*, 270 Ga.App. 155, 158, 605 S.E.2d 879 (2004). In either case, the intent of the parties governs. O.C.G.A. § 13–1–8(b). Here, the 2004 Lease is severable. The sum to be paid is not fixed, but varies based on the revenue generated by the game machines. The three different locations could operate independently of one another under the 2004 Lease, so separate causes lie for each breach.

■ Objectors argue that the 2008 complaint involving Rockbridge could have been amended to add the alleged Panola Road and Ponce breaches and that failure to add those breaches bars the claim now. The Georgia Court of Appeals rejected that position in *Whitley Const. Co. v. Whitley*, 134 Ga.App. 245, 213 S.E.2d 909 (1975). There, appellants argued *res judicata* or estoppel barred suit on post-complaint breaches. The Georgia Court of Appeals disagreed. The court held that, although a plaintiff *may* amend its complaint to add other causes of action, there is no absolute right to amend, and such an amendment is subject to motion and order.

*Id.* at 246, 213 S.E.2d 909. Likewise, Plaintiff has no duty to make such an amendment. As the court stated, "[i]t is more practicable to have a certain cutoff time for the instalments to be recovered in any given action", which under the statute is the commencement of the lawsuit. *Id.* The Georgia Court of Appeals declined to require amendment to obtain recovery of installments coming due between the filing date and final judgment. *Id.*

The first lawsuit related to Rockbridge Road, which resulted in the 2010 Consent Judgment, was brought in January 2008 against the Debtor, alleging a breach of the 2004 Lease by the Rockbridge Store. The breaches alleged by Ultra with respect to the Ponce and Panola Road Stores occurred in late 2008 and early 2009, after the lawsuit was brought. The fact that the Consent Judgment was entered after the alleged breaches at the Ponce and Panola Road Stores does not change the outcome. Thus, the Rockbridge Consent Judgment does not bar Ultra's other claims for breach of contract with respect to the Ponce or Panola Road Stores.

### B. 2004 Lease

The remaining claims involving the Ponce and Panola Road Stores are based on the 2004 Lease. The Objectors raise numerous objections to enforceability of the 2004 Lease: (i) Debtor was not bound by the Lease, because there was no corporate designation by the signature; (ii) the 2004 Lease only pertained to the Ponce Store; Schedule A was simply a recommendation for other locations and was not attached to the 2004 Lease; and (iii) the 2004 Lease is wholly or partially unenforceable for vagueness.

### i. Debtor is Bound by the 2004 Lease

■ The 2004 Lease is signed by Merchant I with the name Al–Karim, along with an address, written under the signature. Merchant I's signature did not state the capacity in which he signed. Issues were raised as to the adequacy of this signature to bind Al–Karim. Under Georgia law, where the corporate designation is omitted and the officer fails to indicate that he is signing in his capacity as an officer, parole evidence is admissible to show the parties' intent to bind the corporation. *See In re Clary,* 259 B.R. 453, 456 (Bankr.S.D.Ga.2001). The evidence in this case reflects the parties' intent to bind the corporation. The $20,000 incentive check was payable to Al–Karim. Merchant I testified he believed Al–Karim was the signer of the 2004 Lease, but just on behalf of the Ponce Store. The Consent Judgment was against Al–Karim for alleged breach of the 2004 Lease. After considering the evidence, the Court concludes the parties intended Al–Karim to be the signer of the 2004 Lease rather than Merchant I individually.

### ii. Stores Covered by the 2004 Lease

■ Much was made by the parties as to which Stores were covered by the 2004 Lease. The Objectors contend the agreement only covered the Ponce Store, the location operated by the Debtor. Ultra contends a "Schedule A" was attached, which included the Panola Road and Rockbridge Road Stores, and the 2004 Lease governs all three locations. Merchant I contends the list on Schedule A was a list of locations to be recommended to Ultra. Although he signed the Schedule A, he contends it did not say Schedule A—it was just a piece of paper with the three addresses of the Stores typed on it. He also contends the variations in the recorded Schedule A's is evidence Schedule A was not actually part of the 2004 Lease

Having considered all the testimony, the Court concludes the typed Exhibit A is the correct version to be attached to the 2004

Lease and that it identifies the stores covered by the 2004 Lease. The Court reaches this conclusion because Merchant I's explanation that this list is simply a recommendation is not plausible. First, the typed Schedule A includes the Ponce Store which all parties agreed and understood was included in the 2004 Lease. Second, Ultra already had games in all three Stores by virtue of Merchant I's prior "recommendation" to place games in those locations. There was no need for a further recommendation. Third, the parties clearly contemplated a Schedule A and, without a Schedule A, there are no locations identified in the 2004 Lease. Fourth, the subsequent actions of the parties demonstrate that Ultra placed games in all three Stores identified on the typed Schedule A and the Stores paid Ultra its share of the game proceeds. The parties presented no other document that governed the relationship between Ultra and the Panola and Rockbridge Stores. Fifth, the typewritten Schedule A includes the handwritten agreement that every twelfth week Ultra would forfeit its commission. Merchant I acknowledges that was the agreement. He cannot have it both ways. If Schedule A is not really part of the 2004 Lease, then the Debtor is not entitled to retain the gaming proceeds every twelfth week. Finally, the typed Schedule A is signed and initialed by Merchant I. So, for all those reasons, the Court finds the typed Schedule A with the handwritten agreement for "every twelfth week free" is the correct attachment to the 2004 Lease. The fact the Ultra employees and representatives attached the wrong Schedule A at times does not change the Court's finding that the typed Schedule A is the correct one. Consequently, the 2004 Lease covers the placement of games at the Panola Road Store.

The question still remains whether that portion of the 2004 Lease is enforceable since Al–Karim did not own or operate the Panola Road Store. In considering the question, it is important to remember the posture in which this decision is rendered. Here, a creditor is enforcing Al–Karim's representation that it would be responsible for the Panola Road Store. This is not a challenge by Al–Ali on behalf of the Panola Road Store that Merchant I obligated Al–Ali, or the Panola Road Store to the 2004 Lease without authorization to do so. In fact, the Panola Road Store used the Ultra games. No evidence was presented that the Panola Road Store complained in any way about Al–Karim's obligating the Panola Road Store to use Ultra's games or obligating itself on the Panola Road Store's obligations.

 The 2004 Lease operates much like a guarantee, which is enforceable if sufficient consideration is provided. Sufficient consideration existed for Al–Karim to obligate itself for Al–Ali and the Panola Road Store. While the companies are not technically brother/sister companies because the ownership varies slightly, they are certainly affiliated companies with overlapping ownership. Al–Karim received $20,000 and "every twelfth week free" in consideration for signing the 2004 Lease. The $20,000 was not made payable to Al–Ali or to Merchant I individually but to Al–Karim, and it is undisputed Al–Karim received the funds. The Court concludes there was sufficient consideration to support Al–Karim's obligation on behalf of the Panola Road Store.

### iii. Enforceability and Breach of the Contract and its Provisions

The Objectors contend the 2004 Lease is too vague to enforce. In particular, the 2004 Lease uses "lessor" and "lessee" in confusing ways and almost interchangeably so as, according to the Objectors, to

make it impossible to understand and enforce the agreement. Ultra argues the Debtor's consent to the Rockbridge Consent Judgment was based on the very same agreement, so it should be estopped from asserting the 2004 Lease is unenforceable.

In Georgia, the law disfavors "the destruction of contracts on the ground of uncertainty if it is possible in the light of the circumstances under which the contract was made to determine the reasonable intention of the parties." *Touche Ross & Co. v. DASD Corp.*, 162 Ga.App. 438, 439–40, 292 S.E.2d 84 (1982) (citations omitted). A contract may be rendered void where the indefiniteness is "so extreme as not to present anything upon which the contract may operate in a definite manner". *Fay v. Custom One Homes, LLC*, 276 Ga.App. 188, 190, 622 S.E.2d 870 (2005) (citations omitted). The test of an enforceable contract is whether it is expressed in language sufficiently plain and explicit to convey what the parties agreed upon." *Advance Sec., Inc. v. Superior Surgical Mfg. Co.*, 197 Ga.App. 769, 771, 399 S.E.2d 488 (1990) (citations omitted). Subsequent words or actions of the parties may make an otherwise indefinite contract enforceable. *Greenway Ins. Agency v. GFA Bus. Solutions, Inc.*, 258 Ga.App. 404, 406–07, 574 S.E.2d 345 (2002). "Because the determination of whether a contract contains the requisite certainty must be made at the time enforcement is sought, an objection of indefiniteness may be obviated by performance on the part of one party and the acceptance of a performance by the other." *Id.* at 407, 574 S.E.2d 345 (citations omitted).; *Touche Ross & Co.*, 162 Ga.App. at 440, 292 S.E.2d 84.

Thus, the Court, in interpreting a contract, must first decide whether the language in the contract is clear and unambiguous. If it is ambiguous in some respect, the Court must apply the rules of contract construction to resolve the ambiguity. O.C.G.A. § 13–2–2. If the ambiguity remains after applying the rules of construction, the issue of what the ambiguous language means, and what the parties intended, is resolved by the fact finder. *Record Town, Inc. v. Sugarloaf Mills Ltd. P'ship of Ga.*, 301 Ga.App. 367, 368, 687 S.E.2d 640 (2009).

One of the rules of construction is that a void provision will not invalidate an entire contract where there is a severability clause. O.C.G.A. § 13–1–8. Here, the 2004 Lease contains a severability clause at paragraph 12 which says, "Should any portion of this Amusement Machine Location Lease for any reason be declared invalid, such decision shall not affect the validity of any remaining portion, which remaining portion will remain in full force and effect as if this Game Machine Location Lease had been executed with the invalid portion eliminated." This paragraph is indicative of the parties' intent that the contract survive even if there are unenforceable provisions. *See Capricorn Sys., Inc. v. Pednekar*, 248 Ga. App. 424, 428, 546 S.E.2d 554 (2001) (citation omitted).

Based on these principles of law, the Court concludes the 2004 Lease is not void and unenforceable as a whole. The parties performed under the 2004 Lease for at least four years before the first alleged breach occurred. The parties understood the 2004 Lease would permit Ultra to place game machines in the various locations in exchange for which the parties would split the revenue from the machines. Rather than considering the 2004 Lease void as a whole, the Court will examine each individual provision at issue to determine if any ambiguity can be resolved or if the severability clause protects the re-

maining contract in light of the avoidance of particular provisions.

Ultra contends Al–Karim breached paragraph 2 of the 2004 Lease by demanding that Ultra remove its machines from the Panola Road and Ponce Stores. The Objectors contend paragraph 2 is not enforceable. Paragraph 2 states:

> The Lessor (Al–Karim) agrees that it will provide a space within the Lessee's (Ultra's) business for the Lessee's (Ultra's) amusement machines for the duration of this Agreement, and any renewal periods. The parties agree that the Lessee (Ultra) will decide which particular machines and the number of machines it will place in the Lessee's (Ultra's) premises. The Lessor (Al–Karim) further agrees to provide adequate electrical outlets, necessary electrical power and lighting to operate the machines and will incur the utility costs.

■ The reference to "Lessor" providing space within "Lessee's" business for "Lessee's" amusement machines clearly contains an ambiguity and the Objectors contend that ambiguity makes the provision unenforceable. The Court can clarify the ambiguity using the rules of construction and the parties' actions. "The construction which will uphold a contract ... is preferred, and the whole contract should be looked" at to determine the construction of any part. O.C.G.A. § 13–22. The rules of construction permit the Court to make corrections where sentences or words are transposed and in some circumstances, the Court can provide missing words. *Id.*

Here, the Lease says in paragraph 1 the Lessor is the owner or tenant of the premises where the machines will be placed, so the contemplation was Ultra's machines were to be placed in Al–Karim's premises. All of the testimony was consistent that Ultra was to place machines in Al–Karim's

business and that is what happened. Further, looking at the 2003 Lease, the terms "Lessor" and "Lessee" were not used; instead the 2003 Lease used "Proprietor" and "Company" in the similar paragraph. It appears that, in converting the form agreement used in 2003 to the form used in 2004, Ultra transposed the word "Lessee" in paragraph 2.

■ The Debtor contends paragraph 2 is unenforceable as to who determined the machines to be placed at the Stores. The Debtor asserts it cannot be liable for demanding the removal of Ultra's machines because the 2004 Lease had no requirement for a minimum number of machines to be located at a store. Paragraph 2 of the 2004 Lease is again ambiguous because it states the "Lessee" (Ultra) is to determine which machines and the number of machines to be placed in "Lessee's" (Ultra's) premises. The Court concludes the ambiguity can be resolved.

Nizar Damani testified that Ultra had the right to decide the number of machines and type of machines to be placed at the premises, but it was decided by mutual consent with the Lessor (Al–Karim). Although he did state as an example that there could be zero machines at a store, Nizar Damani made that statement in response to the question of how the number of machines was decided. He stated hypothetically the parties could decide by mutual consent to have zero machines. Merchant I testified he was the one who decided the number and type of machines to be placed on the premises. His testimony is not necessarily inconsistent with Nizar Damani's. It was clear from Nizar Damani's testimony and demeanor that he would cooperate with respect to the type of machines and the number of machines any particular location wanted. This does not mean he would have actually agreed to zero ma-

chines. Further verification of this construction comes from the 2003 Lease signed by Merchant I individually which has an identical provision in it—the Company (Ultra) is the party who determines which machines are, and the number of machines, to be placed at a store.

Therefore, the Court's interpretation of paragraph 2 is that Ultra had the right to decide how many and what type of machines were to be placed at a store in cooperation with the location owner. This construction is consistent with the written document as well as the actual understanding and operations of the parties. Consequently, when the Ponce and Panola Road Stores demanded that Ultra remove its machines entirely, Al–Karim breached paragraph 2 of the 2004 Lease. Exhibits R–2 and R–3 reflect that the Panola Road Store demanded the removal of Ultra's machines on December 4, 2008, and the Ponce Store demanded removal of Ultra's machines on March 30, 2009. Those are the dates the 2004 Lease was breached. (Objectors further argued the restrictive covenant and exclusivity provisions in the 2004 Lease were unenforceable. Upon finding the Debtor breached paragraph 2 of the 2004 Lease, the Court need not reach the question of whether either the restrictive covenant or exclusivity provision is enforceable or was breached.)

### C. Damages
#### i. Method of Calculations

Ultra asserted a claim for liquidated damages under paragraph 6 of the 2004 Lease. The Objectors argue that the liquidated damages provision is unenforceable. The Court agrees and Ultra withdrew its request for liquidated damages in its closing argument.

Ultra now claims lost profits suffered as a result of the early removal of its machines from the Panola Road and Ponce Stores. Under Georgia law,

■ Ordinarily, anticipated profits are too speculative to be recovered, but where the business has been established, has made profits and there are definite, certain and reasonable data for their ascertainment, and such profits were in the contemplation of the parties at the time of the contract, they may be recovered even though they cannot be computed with exact mathematical certainty. Nonetheless, to recover lost profits one must show the probable gain with great specificity as well as expenses incurred in realizing the profits. In short, the gross amount minus expenses equals the amount of recovery.

■ *KAR Printing, Inc. v. Pierce*, 276 Ga.App. 511, 511–12, 623 S.E.2d 704 (2005) (citations omitted). Here, the 2004 Lease, with a stated ten-year term, would have expired in July 2014. Since the term of the 2004 Lease passed before this hearing, the calculation of lost revenue is not too speculative because the parties have actual operations during the remaining term on which to base lost profit calculations. Moreover, the parties have a history of conducting business from 2004 until 2008 (Panola Road) or 2009 (Ponce) on which lost revenue and expenses can be based.

■ Before making a mathematical calculation as to the amount of Ultra's Claim, a few additional issues must be resolved. Objectors question the term of the 2004 Lease. The 2004 Lease states clearly the term is ten years from the date of the agreement. (Exhibit M–1, p. 25). Merchant I testified there was another version of this lease where "ten" had been stricken and "three" had been written. He contends that, after three years, the 2004 Lease became a month–to–month agreement. No one presented this "other" lease to the Court. The 2004 Lease pro-

vides in paragraph 14 that it is not subject to "change, modification or discharge in whole or in part except by written instrument signed by the parties". Notwithstanding this provision, under Georgia law, parties may modify a written agreement through their conduct, even when the contract itself contains a "no waiver" clause. *Brookhaven Landscape & Grading Co. v. J.F. Barton Contracting Co.*, 676 F.2d 516, 522 (11th Cir.1982) (collecting cases). Nevertheless, there is insufficient evidence of conduct consistent with a three-year term. The only possible evidence supporting Merchant I's allegation that the term was three years, is the change in the percentage paid to Al–Karim from 70% to 80% at approximately the three-year mark, discussed below. That change alone is not sufficient for the Court to find the term was modified from ten years to three years. Thus, the 2004 Lease had a ten-year term.

Next, the Court considers the percentage to be paid to Al–Karim on the Ponce Store. Although the 2004 Lease states that 70% is to be paid to Al–Karim, the parties mutually agreed to depart from this term and paid Al–Karim 80% on the Ponce Store beginning in July 2007. Merchant I testified to this fact; the computer records, which are Exhibit D to the proof of claim, show that in July 2007 Ultra began recording the amounts due to Ultra as only 20% instead of 30%. Finally, Samir Damani, who was the Ultra collector for the Ponce Store beginning in mid to late 2007, testified that it was an 80/20 split, his supervisor at Ultra knew of the 80/20 split, and he had to manually override the 70/30 split that was in his handheld computer device to 80/20. The Court therefore finds the game revenue split between Al–Karim and Ultra as to the Ponce Store changed to 80/20 beginning in July 2007.

The parties also dispute the application of the "twelfth week free provision," written on Schedule A. Samir Damani testified he thought the "every twelfth week free" terminated when the commission split changed from 70% to 80%, but there was no further testimony regarding this belief. The Court concludes the provision was not terminated and must apply to all three Stores because all three Stores are governed by the 2004 Lease. The 2004 Lease is only with Al–Karim, and so Al–Karim should receive credit for the "every twelfth week free", on all three Stores.

The Georgia gaming statutes changed effective April 10, 2013, O.C.G.A. § 50–27–70 *et seq.*, and the parties contest its effect on lost profits. The 2013 statute required agreements between an amusement machine provider and a location owner to be in writing and provided that it was an unfair business practice for the location owner to receive more than 50% of the revenue. O.C.G.A. § 50–27–87.1(1). The new gaming statute also required substantial changes to the way business was conducted in terms of the transmission of payments and prohibited the payment of incentives. No evidence was presented as to how Ultra addressed these issues with other customers or how the Panola Road or Ponce Store addressed these issues with its gaming vendor at the time.

The parties brought to the Court's attention a Gwinnett County Superior Court decision in Case No. 13–A–07260–10 that determined that, as of April 10, 2013, similar contracts became unenforceable because they demanded consideration in excess of 50%, and the Court could not reform the contract to make it enforceable. The Objectors urge the Court to follow the Gwinnett County Superior Court's decision. Ultra, on the other hand, argues that, when a 70/30 or 80/20 split became unenforceable, the con-

tract automatically adopted a 50/50 split. The Court need not decide whether the contract was enforceable or unenforceable as a result of the April 10, 2013 change in the law. Instead, the Court determines that, given the radical change in the law governing such agreements as of April 10, 2013, the amount due under any contract existing at the time and the effectiveness of such contract is too speculative to form the basis upon which to calculate lost profits. Therefore, the Court will make no award of damages for lost profits after April 9, 2013.

It is undisputed that Al–Karim entered into a Real Property Lease agreement with P & C Investment Group, Inc. on July 1, 2000 for the operation of the Ponce Store. Al–Karim was a party to this Real Property Lease when both the 2003 Lease and the 2004 Lease were executed. The Real Property Lease was only for a period of ten years and two months, ending on August 31, 2010 at midnight. When the Real Property Lease ended and was not renewed by Al–Karim, Al–Karim ceased business. Ultra could not "force" Al–Karim to stay in business. Once Al–Karim ceased business, Ultra could not earn any revenue from Al–Karim. Ultra argues that Al–Karim did not renew the Real Property Lease because Merchant I created a new company which then began operating at that location. Ultra contends Al–Karim should continue to be liable for lost profits after August 31, 2010. The Court disagrees. No evidence was presented to support Ultra's contention that Merchant I or his "new" company was a continuation of Al–Karim. Without expressing any opinion as to Merchant I's liability in connection with allegedly operating the Ponce location with a different company or whether he personally has liability for any alleged lost profits after August 31, 2010, the fact remains that Al–Karim, the Debtor, ceased operating when the Real Property Lease terminated on August 31, 2010. Therefore, any lost profits due to Ultra from the Debtor also must cease as of August 31, 2010.

Finally, the evidence showed the number of game machines at the Ponce Store varied from four to thirteen prior to the Debtor's breach of the 2004 Lease, but most often the Ponce store had six or seven games per month. The evidence also showed Nizar Damani was flexible with the number of games provided. The court must decide how many game machines it should assume the Ponce Store would have had if the 2004 Lease were not breached. It is undisputed that Al–Karim continued using game machines in its premises until Al–Karim ceased operating in August 2010. Merchant I testified that it generally had six machines at any time, which is consistent with its pre-breach operations. The lost profits owed by Al–Karim on the Ponce Store from the date of the breach on March 30, 2009 through August 31, 2010 are therefore calculated on the basis of six game machines. The number of machines at the Panola Road Store appears to consistently be between four and five machines, and no testimony was presented that, after the Ultra machines were removed from the premises, the Panola Road Store used less than four or five machines. The lost profits on the Panola Road location are calculated from the date of the breach on December 4, 2008 through April 9, 2013. Since the number of machines did not vary much, the Court has made no adjustment to the number of machines in calculating lost revenue.

The Court has reviewed the methodology used by Ultra to calculate lost profits from the Ponce and Panola Road Stores. Ultra began by calculating its total historical revenue from the two Stores based on a 70/30 split of the game machine pro-

ceeds. Ultra then divided its total historical revenue by the number of days from the start of the 2004 Lease to the last collection under the 2004 Lease to arrive at a daily revenue rate. Ultra then multiplied that daily revenue rate by the number of days between the breach of the 2004 Lease and the scheduled termination date of the 2004 Lease to determine total lost revenue. From the total lost revenue, Ultra subtracted its calculation of the "every twelfth week free" and expenses that were saved by virtue of not servicing the Panola Road and Ponce Stores.

### ii. Panola Road Store Lost Profits

The Court has few changes to Ultra's calculation of damages attributable to the Panola Road Store. The Court agrees that, according to Exhibit R–9, the total historical revenue Ultra received from the Panola Road Store as of the last collection was $223,174.00. No evidence contradicted the 2004 Lease provision that the split between the Panola Road Store and Ultra was 70/30. Based on the total historical revenue of $223,174.00, divided by the

number of days from the 2004 Lease date to the last collection, the daily revenue lost by Ultra from the Panola Road Store was $141.88. The Court disagrees, however, as to the length of time over which the profit should be calculated. Ultra asserted the breach occurred on November 12, 2008, but the evidence (Exhibit R–2) showed it actually occurred on December 4, 2008 when the Panola Road Store called Ultra to pick up its machines. Lost profits should be calculated from the date of the breach—December 4, 2008—through April 9, 2013, or 1,585 days. At $141.88 a day, the total lost revenue is $224,880.00. Ultra concedes, and the Court agrees, that the Panola Road Store was entitled to "every twelfth week free", and using $141.88 per day and a breach period of 4.3 years, that number is calculated at $17,082.35. Finally, Ultra contends it saved expenses of $28.92 a month by not servicing the Panola Road Store. Over the fifty-two-month period of the breach, that comes to $1,503.84 in savings. So, to summarize, the damage calculation for the Panola Road Store:

$224,880.00 ($141.88 a day x 1,585 days = total lost revenue)
($17,082.35) (every twelfth week free)
 ($1,503.84) (expenses saved)
$206,293.81 (lost profits)

### iii. Ponce Store Lost Profits

The methodology for calculating the Ponce Store lost profits is similar. Ultra's calculation of total historical revenue begins with the assumption that it was entitled to a 70/30 split for the entire tern of the 2004 Lease. The Court has already ruled the split was changed to 80/20 in July 2007 and it is the 80/20 split that applies throughout the remaining term of the 2004 Lease. Ultra introduced several exhibits to prove its historical revenue from the Ponce Store. It offered Exhibit R–10, which was Samir Damani's recalcu-

lation of Ultra's share as if the split were 70/30 for the entire term of the 2004 Lease. Ultra asserted the total historical revenue it should have earned pre-breach at a 70/30 split was $532,410.00 and the lost profits should be based on this revenue.

Ultra also submitted Exhibit M–1 (its Claim) and Exhibits D and E thereto to prove its historical revenue. Exhibit E shows historical revenue as $491,804.00. The revenue number is calculated sometimes at an 80/20 split and sometimes at a 70/30 split. This historical revenue num-

ber is not a valid basis for calculation of future lost profits, because Exhibit E includes a long period where the split was calculated at 70/30, while the Court has concluded future profits should be calculated at an 80/20 split. Using Exhibit E would skew the future profits in Ultra's favor.

Moreover, the Objectors raised a number of issues and pointed to a number of inconsistencies with respect to Exhibit E. First, no payments are recorded until mid–2005, a year into the 2004 Lease term. Nizar Damani testified that Ultra did not track payments in any organized fashion until mid–2005. Then, through cross-examination, Nizar Damani admitted numerous times that the computer entries were simply wrong. Samir Damani, who was the actual collector, testified to his notes in calculating the amounts due from the Debtor when he was the collector from mid to late 2007 through the end of the relationship with the Debtor. In comparing his handwritten notes as to what was received and what was paid to the computer records, the computer records did not match in several instances. For example, on at least two occasions money was simply "given" to Merchant I or Al–Karim but not accurately accounted for in the computer records. Additionally, no one could testify as to whether the "every twelfth week" credit of Ultra's commission was reflected in any way in the computer record calculation. The Court finds Exhibit E to be unreliable.

Finally, Ultra introduced Exhibit R–8, which is Samir Damani's handwritten calculations of Ultra's and Al–Karim's share of the game revenue created at the time of each collection from the Ponce Store. Exhibit R–8 covers a one-year time period which is a sufficient history on which to base projections of future lost revenue. Exhibit R–8 is also preferable as a starting point, because all of the calculations are based on an 80/20 split, which is the basis on which any future profits should be calculated. Thus, while the Court uses Ultra's methodology for calculating lost profits, the actual numbers differ from Ultra's.

For the one-year period evidenced by Exhibit R–8, Ultra's total historical revenue, at 20%, was $88,673.00. Dividing total historical revenue by the 365 days covered by Exhibit R–8 yields daily revenue of $243.00 for seven machines or $35.00 per machine per day. Merchant I testified that, after the Ultra machines were removed, the Ponce Store reduced the machines to six. Recalculating daily revenue based on six machines at $35.00/day, the daily lost revenue rate is $210.00. The next question is the time period over which the profits were lost. The period begins on March 30, 2009, according to Exhibit R–3 when the Ponce Store asked Ultra to remove its machines, and ends on August 31, 2010 when the Real Property Lease for the Ponce Store expired, a total of 516 days. The total lost revenue is therefore $108,360.00 (calculated at 516 days times $210.00 a day). Calculating the "every twelfth week free" by Ultra's method (that is $210.00 a day times seven days a week times four times a year) equals $5,880 a year. The breach period is approximately one year and five months, so that is a total reduction of $8,232.00. Finally, Ultra asserts it saved expenses of $77.59 a month, so multiplying that amount by 17 months yields savings of $1,319.00. To summarize, the lost profits for the Ponce Store:

$108,360.00 ($210.00 a day x 571 days = total lost revenue)
($8,232.00) (every twelfth week free)
 ($1,319.00) (expenses saved)
$ 98,809.00 (lost profits)

#### iv. Conversion at Ponce Store

Finally, Ultra claims the Debtor converted $142,542.00 otherwise due Ultra plus interest at the rate of 7% pursuant to O.C.G.A. § 7-4-2. In support of this calculation, Ultra introduced the computer printouts attached as Exhibits D and E to the Claim. The testimony, though, showed that this computer printout is unreliable in all respects, as discussed above.

For the period February 8, 2008 through February 6, 2009, Samir Damani's collection records for the Ponce Store show $37,472 was due Ultra. For Ultra's claim of conversion of $142,000.00 to be valid, the Debtor must have owed Ultra over $100,000 as of February 2008. The possibility that Al-Karim was more than $100,000.00 behind in payments to Ultra as of February 2008 is unlikely. First, no demand was made on Al-Karim or Merchant I for the repayment of the $100,000.00 allegedly owed at that time. Second, it seems unlikely that a reasonable business person would have continued to transact business with an entity that owed it over $100,000.00. It is even more unreasonable to believe the person would have reduced the percentage that it was due from 30% to 20% in July 2007 when it was already owed substantial sums from that customer.

Lastly, any claim by Ultra for sums due prior to January 2008 from Al-Karim for any of the Stores should have been included in the lawsuit filed against Al-Karim in January 2008. While the Court may agree a small account receivable could be excluded from the lawsuit as being in the ordinary course of business, a receivable of over $100,000.00 would not seem to be "ordinary". Even if the claim for $100,000.00 is not barred by *res judicata*, the fact that Ultra did not pursue it in January 2008 when it was already in litigation with Al-Karim casts further doubt on the validity of that claim. Thus, given the unreliability of the computer printout supposedly evidencing the amount due, and the inconsistency of Ultra's actions with an allegation that over $100,000.00 was due in January 2008, the Court only finds believable that Al-Karim owes Ultra $37,472.00 as of February 6, 2009. Interest at 7% is added to this claim until the petition date pursuant to O.C.G.A. § 7-4-2.

### III. Conclusion

To summarize, Ultra has a claim in this bankruptcy case as follows:

- Rockbridge Consent Judgment— $102,000 plus interest at a rate of 6.25% to the petition date;

- Lost profits from the Panola Road Store in the amount of $206,293.81;

- Lost profits from the Ponce Store in the amount of $98,809.00; and

- Conversion of funds from the Ponce Store in the amount of $37,472.00 plus interest at 7% from February 9, 2009 to the petition date.